Moncure, P.,
delivered the opinion of the court.
The court is of opinion that the testator, Peter Whitesel, by his will, bearing date the 18th day of December 1861, gave all his estate, real and personal, to his son, Simon Whitesel, except two hundred dollars, which he gave to his grand-son, Peter Asbury Whitesel; and that the said gift was in absolute property without any limitation, restriction or incumbrance whatever, except that Ms said son, Simon, should take care of and support his son John, who is an idiot, during his natural life, and provide for him and keep Mm comfortable. Such is the express and plain language of the will, which leaves no room for doubt or construction. Indeed no question is attempted to be raised as to the true construction of the will. But the object oí the suit is to establish a secret trust for the benefit of the other heirs at law of the testator, and to make Simon a trustee for their use. The pretension is, that the testator had made a former will, giving his property to all his children, in substance equally; that all of his childi’en, except Simon and John, lived in the States of Indiana and Illinois, and were so living at the commencement of and during the war; that during the same period Simon and John lived with their father, as they had always done, in the county of Rockingham, in the State of Virginia; that the said Simon availed himself of the opportunity thus afforded, fraudulently to impress upon the mind of his father, who was then very old and infirm, the idea that if he should *907 die, and his former will should remain in force, the portion of his estate so given by that will to his non-resident children, would be confiscated by the government of the Confederate States by reason of their occupying the attitude of alien enemies; that the said Simon and his friends so far operated upon the mind of his father by the said fraudulent representations, that the said property would be confiscated if the said former will were not revoked and the said Simon so far gained the confidence of his father by fraudulently declaring that if the said property were all devised to him, so as to avoid the danger of the confiscation of the interests of the nonresident children in said estate, according to said former will, he would, after the termination of the war, make a fair and equal division of said property according to the provisions of the former will; and that he thereby induced his father to make a new will, in which he devised all his said property to him the said Simon, but with the express verbal direction and condition that said Simon, after the termination of the war, should make a fair and equal division of said property, according to the former will; which verbal instructions andfoonditions, the said Simon then and there promised faithfully to perform.
• Thisjs the case made by the bill. Simon "Whitesel, in his answer, on the other hand, admits it to be true, that the testator did make a will in writing about 27 years ago, by which he directed his estate to be distributed among his children, not equally however. He required the respondent to help his idiot brother John during his life. Respondent was to have the real estate of his father as long as John lived, and was then to pay out certain monies to the other heirs; and to have f 1,500 more than any of the other heirs. He believes that this will was destroyed by his father, at or about the time of the *908 execution of his last will in 1861. He also admits it to be true, that during the late war, to wit: In December 1861, the testator executed his last will. But it is not true that said last will was obtained by any uniair or fraudulent means, or that respondent fraudulently impressed, or sought to impress, upon his father’s mind, the idea that upon his death the estate given to his other children by the former will, would be confiscated by the government of the Confederate States. Respondent, however, is of the opinion, that his father did believe that any estate he might will to the complainants, who were then and now in the Western states, would be in danger of confiscation; but that belief was not induced by any fraudulent representations of respondent, or any one else, so far as respondent knows or believes, if or is it true that respondent gained the confidence of his father by fraudulently declaring that if his father would will his property to him, to avoid the danger of confiscation, he would, after the war, make a fair and equal division of said property according to the provisions of the former will; nor was the said last will obtained by any fraudulent contrivance whatever. At the time of its execution the testator was in his perfect senses. Though old and infirm in body, his intellect was clear and good. For about six years prior to his death, in 1864, he did no work, and for more than two years prior to his death, he was helpless, physically, and required care and nursing. The condition of testator’s son John had changed greatly for the worse, and the care and management of him had been for many years exceedingly troublesome. In addition to his other afflictions he became paralyzed some eight years ago, and became helpless, and for about four years he had to be nursed, washed and cleansed as if he were an infant, which has to be'done by respondent and his wife, a *909 disagreable duty which no mere pecuniary compensation could reward sufficiently. Indeed, the whole estate, which is over estimated by complainants, would be an ■ • inadequate compensation to respondent and his wife for the services they have performed in the care and watching of the testator and his son John. This was, as respondent believes, the ruling consideration which induced the testator to make his new will; though it is the opinion of respondent that he was, to some extent, influenced by the idea that any property he might devise to complainants might incur the risk of confiscation. The testator never did order or direct this respondent to make an equal distribution of his estate, after the war, with respondent’s brothers and sisters, nor did he ever promise so to do. The farthest that testator ever went upon the subject was, to say to respondent that he should be fully compensated for the care of himself and his son John ; that neither knew how long this burden would continue; but that when these charges should cease, he wished respondent to do what he thought right with his brothers and sisters, in regard to the residue of his estate, if any remained after just compensation to respondent. There was no order, no condition, no contract upon the subject. It was left to the will of respondent ; and he is very willing, nay anxious, if complainants will pay him a just compensation for his trouble and care about his father and John, and for his improvements upon the farm, to make an equal division; or rather to receive from complainants the amount they would owe him upon such an adjustment.
This is the case made by the answer; and we think the evidence fully sustains it. There is not a particle of evidence of any fraud or undue influence, or indeed of any influence of any kind, being used by Simon "Whitesel to induce his father to make the new will. On the *910 contrary, it clearly appears that the testator was not only of perfectly sound mind when he made that will, but that he made it of his own accord, in view of all the cir-7 oumstances, without being unduly influenced, or influall, by the opinion of any body. He was no doubt influenced, to some extent, by the apprehension that any property he might give to his non-resident children might be confiscated, and he intended to avoid that consequence by giving all his property, (with a small exception,) to his resident children. This he certainly had a right to do; and even though he may have been mistaken in his apprehension, yet his act not having been induced by any fraud or undue influence on the part or behalf of those who are benefitted by the new will, that will is perfectly valid. A mere expectation or request on his part that his son Simon would distiibute a portion of the property among his non-resident brothers and sisters, whenever it could be done without danger of confiscation, would not, of itself, create a trust in their favour which could be enforced either at law or in equity. The obvious arrangement of the father was to give the property to his son Simon absolutely, and to trust implicitly in him that he would do what he thought to be right. He had perfect confidence in the integrity of his said son, and in his affection for his non-resident brothers and sisters. He did not intend to give them any interest in law or equity in the property; for it would have been fatal to the object he had in view to have done so. His only way of effecting that object seemed to be the one he pursued, of giving the property absolutely to a person in whom he reposed perfect confidence, who knew his wishes, leaving it to that pei’son to dispose of the property according to his uncontrolled discretiosi and pleasure.
But this was not the only, nor the chief object which *911 the testator had in view in making his new will. He had two sons who had lived with him always from their birth, one of them, his idiotic son John, about whose welfare he was extremely solicitous; and the other, his son Simon, who had taken good care both of himself and John, and on whom alone he depended to take care of both so long as they might stand in need of such care. All his other children had, many years before, received advancements from him, and gone off to distant States, and taken up their permanent residences there. Simon spoke of going likewise; but his father appealed to him to remain and take care of the father in his old age, and the idiotic brother in his severe affliction. Simon heeded the appeal, complied with his father’s request, and with true filial and fraternal devotion remained with and took good care of his father during his life, and has taken good care of his brother John ever since. Nothing was more reasonable than that the father should provide most amply for his son Simon, and through him, for his unfortunate son John also; and that that object should be paramount to all others, in the disposition which the testator made of his estate. It is not strange, therefore, that by his will, he gave his remaining estate, with a small exception, to his son Simon in absolute property, leaving him to give to his non-resident brothers and sisters such portion of it, if any, as he might be willing to spare, after fully providing for the main and paramount object of taking good care of his idiotic brother during his life, and of doing full justice to himself. The evidence shows that he has had a heavy, and a most disagreeable burden to bear in taking care of his unfortunate brother. Several of the witnesses described the unpleasant duties he has had to perform in regard to this brother, and say that they would not have to do them for the whole estate; and Simon himself says that *912 no mere pecuniary compensation could be sufficient for the services lie has bad to perform. And yet he has always-them willingly, kindly, and affectionately. Testimony was taken to show that a common laborer might have been hired to take care of the idiotic brother: but the father was not contented with that kind of care, he wanted the affectionate care of a bi’other and a sister; and accordingly he secured the services of his son Simon and his wife, who have devoted their lives to the duty of taking care of their afflicted brother. It does not appear that in a single instance, either of them ever failed to perform that duty in any respect, or to manifest towards the object of their charge the utmost tenderness and affection. The record affords affecting evidence of the anxiety of the testator about his son John, and of the grateful sense he felt for the kind attention shown to John by Simon, and especially Simon’s wife. The welfare of John, as one of the witnesses said, “ seemed to be the theme of the old man’s conversation generally. All the trouble he seemed to have was the care that was to be taken of J ohn after bis death. He used to say that God seemed to have sent Catharine, Simon’s wife, to take care- of him and John in their declining years.” The record also affords us an affecting instance of his strong desire to remain where he was, in the land of his birth, and where his wife was buried, and that his son Simon should remain with him. Simon, being asked on his examination, as a witness in this case : “ What was your father’s objection to your going to the West?” Answered: “He said he was very old, and had got acquainted with my wife and was treated so well by her, and a good many of his children had married in the west, and he knew nothing about their wives, and his son John was used to me, and I was used to him, and I could manage him much better than any body *913 else, and he did’nt expect to live long, and did’nt want to be bothered in his old days to move, and he wanted to be buried where his wife was buried. Simon wanted to go to the west very badly. His wife and his whole family were willing to go. He wished to buy land there as the other children had done, and he had the means of doing so, gotten in part by his wife. Had he gone, he would no doubt greatly have improved his fortune, as it seems the other children did theirs. But he could not resist the persuasion of his father, and remained and took care of the old man and his afflicted sou.,
The property in controversy is of no great value, and it is by no rheans certain that after deducting what was intended for Simon by the old will, the surplus would be more than a bare compensation for the trouble he has had, and will have, in taking care of his father and brother. The former will was made twenty-seven years before the latter. When the latter was made, Simon had no doubt been subjected to much greater trouble and labour on account of his father and brother than was expected of him when the former will was made; and he had therefore much stronger claims on the bounty of his father. It was not known how long the old man and John would still live; although the former was about ninety years old, and the latter about sixty. The former lived three or four years longer, and the latter is still living, being now about seventy years of age. He may live to the age of his father. The older he becomes the more burdensome of course is the expense and trouble of taking care of him. Wliether Simon ought in conscience to give any thing to his non-resident brothers and sisters, is a question he will have to decide for himself when his brother John dies, and he will no doubt decide it justly. But they can have no claim against him in law or equity, either now *914 or then, or at any other time. We think there is no error in the decree, and that it ought to he affirmed.
Decree aeeirmed.